In re Mark James BARR and Stacy Ratisseau Barr, Debtors.

Bankruptcy No. 594–50721–7.

United States Bankruptcy Court, N.D. Texas, Lubbock Division.

April 11, 1995.

Robert W. St. Clair, Harding, Bass, Fargason & Booth, L.L.P., Lubbock, TX, for Seminole Nat. Bank.

Deborah J. Penner, Chapter 7 Trustee, Lubbock, TX.

## MEMORANDUM OF OPINION ON UTILITY DEPOSIT AND CAPITAL CREDITS OF AN ELECTRIC COOPERATIVE

JOHN C. AKARD, Bankruptcy Judge.

### Issue

The issue before the court is whether Seminole National Bank's (SNB's) perfected security interest covers Debtors' utility deposit and capital credits with Lea County Electric Co-op (Co-op). The parties stipulated that if the court finds that SNB has a perfected security interest in the utility deposit and capital credits, relief from the automatic stay as to those two items is proper.

### Positions of the Parties

In this proceeding, SNB seeks to remove the automatic stay placed upon it by the filing of the Chapter 7 petition in order to collect Debtors' utility deposit and capital credits held by Co-op.[1] SNB alleges that the utility deposit and capital credits are covered by their properly perfected security agreement. However, the Chapter 7 Trustee asserts that the utility deposit and capital credits are property of the bankruptcy estate and, therefore, the automatic stay should not be lifted as to them.

### Procedural History

On September 30, 1994, Mark James Barr and Stacy Ratisseau Barr (Debtors) filed a Chapter 7 petition. SNB filed a Motion for Relief from Automatic Stay on November 10, 1994. After receiving no objections to SNB's motion, the bankruptcy court signed an order terminating the automatic stay on November 29, 1994. The order allowed the stay to be lifted as to certain property, which included

1. This court has jurisdiction of this matter under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and Miscellaneous Rule No. 33 of the Northern District of Texas contained in Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* dated August 3, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1), (b)(2)(G).

the utility deposit and capital credits that Debtors had with the Co-op.

Subsequently the Trustee filed a limited Motion for Rehearing and Reconsideration with respect to the utility deposit and capital credits held by the Co-op. The court granted this motion on December 12, 1994. Both parties appeared on January 4, 1995 for the final hearing. With the consent of the court, both parties agreed to submit this dispute upon stipulations and briefs.[2]

### Facts

The Debtors resided in New Mexico, but engaged in farming and ranching operations in Gaines County, Texas. In 1994, the Debtors executed two promissory notes to SNB. The first note, dated March 3, 1994, was in the principal sum of $22,075.19. On that same day, SNB and the Debtors entered into a commercial security agreement. On June 23, 1994, the second promissory note was made between Debtors and SNB. The original principal sum on this note was $162,020.32. Once again, this note was accompanied by a security agreement. The notes' proceeds were used to finance the Debtors' 1994 operations.

SNB perfected its security interest in both Texas and New Mexico, respectively. Under the security agreements, SNB had a perfected first lien in the following property of the Debtors: a vehicle and all equipment, inventory, accounts, contract rights, general intangibles, farm products, livestock, farm equipment, government payments, growing crops and proceeds therefrom, and fixtures on real property in both Texas and New Mexico.

During 1994, Debtors defaulted on both notes. They then filed their Chapter 7 petition. Both parties acknowledge that Texas law applies in this case. In the security documents, the Debtors agreed that any controversies arising would be governed by and construed in accordance with the laws of the state of Texas and applicable federal laws.

2. The court adopts the stipulations filed by the parties. Additionally, the parties provided an Agreed Supplement to Stipulations, denominated Exh. 5, which states that the Co-op does not issue

### Discussion
### Debtors' Capital Credits Were General Intangibles

A brief explanation of the capital credit and its purpose aids in this analysis. Cooperatives receive special tax treatment because of their nonprofit nature. In order to receive this special tax treatment, the co-ops must return profits to their patrons. Usually, these profits are calculated annually. The co-op distributes the profits pro-rata based on the amount of business done with the co-op by individual patrons. A co-op only pays out a certain percent of the annual profits in cash; it keeps the remaining profits and uses them as operating capital. Consequently, the co-op credits the patrons with the amount of profits owed them but left unpaid. Eventually, the credit is redeemed or retired in cash when the patron reaches a specific age or at death. No interest or dividends accrue on capital stock. *Nelson v. Cavalier Rural Electric Co-op. (In re Axvig )*, 68 B.R. 910, 912 (Bankr.D.N.D.1987).

The court looks to Article 9 of the Uniform Commercial Code (UCC) to determine the proper characterization of these capital credits. Texas adopted the UCC and Article 9 is codified as Chapter 9 of the Texas Business and Commerce Code. Since capital credits do not fit under any specific definitions in Article 9, we turn to the "general intangibles" section. Texas law defines "General Intangibles" as "personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." TEX.BUS. & COM.CODE ANN. § 9.106 (Tex. UCC) (Vernon 1991). The general intangible definition acts as a catch-all. TEX.BUS. & COM.CODE ANN. § 9.106 comment (Tex. UCC) (Vernon 1991). Consequently, it brings under this article miscellaneous types of contractual rights and other personal property which are used or normally may be used as commercial security. *Id.*

Though no Texas cases have addressed the classification of capital credits, a few court decisions have spoken to this point. It has

patronage capital certificates on its allocated patronage, but merely sends patrons notice of the prior year's allocation. $8,368.49 is the Debtors' total allocation from 1975 through 1993.

been held that a member's interest in its capital account in a cooperative is an equity interest. *In re F.L.F. Farmers Co-op. Ass'n, Inc.*, 170 F.Supp. 497 (D.N.J.1958); *In re Williams*, 167 B.R. 77 (Bankr.N.D.Miss. 1994); *Money Store Inv. Corp. v. Liscinski (In re Wholesale Warehouse, Inc.)*, 141 B.R. 59 (Bankr.D.N.J.1992); *Taylor v. Assumption Co-op. Grain Co. (In re Beck)*, 96 B.R. 161 (Bankr.C.D.Ill.1988) (holding debtor's allocated retained earnings account was property of the estate since it was an unperfected general intangible).

Since it is an equity interest, the patron has some ownership interest in the intangible property. Since the patron has an ownership interest in the property, courts have tried to classify this interest. By their very nature, capital credits exclude themselves from most categories. Therefore, courts have found that capital credits fall into the general intangible catch-all category. The courts have taken the position that unless a stock certificate is issued evidencing a member's interest in a cooperative, such interest is in the nature of a general intangible. *Williams*, 167 B.R. at 81; *Axvig*, 68 B.R. at 917; *In re Cosner*, 3 B.R. 445, 448 (Bankr. D.Or.1980) (holding that the account can only be classified as a general intangible, since it is incapable of being reduced to possession in order to perfect.).

 The court finds that the capital credit is a general intangible for purposes of Chapter 9 of the UCC. However, this does not end the analysis. It must also be determined that the capital credit was described in the security agreement. Section 9.110 of the UCC states that "Except as provided in Subsections (c) and (f) of Section 9.402, any description of personal property or real estate is sufficient for the purposes of this chapter whether or not it is specific if it reasonably identifies what is described." TEX.BUS. & COM.CODE ANN. § 9.110 (Tex. UCC) (Vernon 1991). Additionally, the requirement of description of collateral is evidentiary. TEX.BUS. & COM.CODE ANN. § 9.110 comment (Tex. UCC) (Vernon 1991). Furthermore, "the test of sufficiency of description is that the description do the job assigned to it—that it make possible the identification of the thing described." TEX.BUS. & COM.CODE ANN. § 9.110 comment (Tex. UCC) (Vernon 1991); *See Unicut, Inc. v. Texas Commerce Bank–Chemical*, 704 S.W.2d 442, 444 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

 In applying the "reasonably identifies" test, the court finds that the capital credits were adequately described. Both parties knew going into the signing of the security agreement that descriptions of collateral do not have to specify the exact piece of property. By including the general intangible catch-all, Debtors were put on notice that most interests they had would be covered under the security agreement. Therefore, the capital credits were properly perfected as general intangibles under the security agreement.

### The Utility Deposit Is Not A General Intangible

The Co-op required a deposit as a condition of uninterrupted electrical service to Debtors' farming operations. SNB asserts that the deposit should be classified as a general intangible and, therefore, covered by the properly perfected security agreement. The Trustee believes that it is not properly characterized as a general intangible and, thus, should be part of the bankruptcy estate.

The security deposit presents some interesting questions about the treatment it should given: 1) Is it a deposit account? If so, then it is excluded from Chapter 9 of the UCC; 2) Is it a general intangible?; and 3) Does it receive special treatment by Chapter 9 of the UCC?

 Under § 9.104 of the UCC, a "deposit account" is specifically excluded from Chapter 9, except with respect to proceeds and priorities in proceeds. TEX.BUS. & COM.CODE ANN. § 9.104 (Tex. UCC) (Vernon 1991). Proceeds are not relevant to this case.

Section 9.105 defines a "deposit account" as "a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit." TEX.BUS. & COM.CODE

ANN. § 9.105 (Tex. UCC) (Vernon 1991). In the instant case, the utility deposit was not a demand, time or savings account. Additionally, it was not maintained by a bank or savings and loan association, but by a cooperative. Therefore, the utility deposit constitutes an item covered by Chapter 9 of the UCC.

The next step is to determine if the utility deposit is a general intangible. As previously stated, a general intangible is "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." TEX.BUS. & COM.CODE ANN. § 9.106 (Tex. UCC) (Vernon 1991). The parties have not directed us to, nor has the court found, any cases directly on point which address the classification of a security deposit. However, the court finds *In re Atlanta Times, Inc.*, 259 F.Supp. 820 (N.D.Ga.1966) persuasive. *Atlanta Times* dealt with a newspaper which filed a Chapter XI petition under the Bankruptcy Act. This case is instructive because of the treatment the court afforded the security deposit given by the Times to its landlord, Commercial Credit Corporation (CCC). Upon execution of the lease, the Times paid CCC $145,000 as a deposit to secure its payment and performance of any obligations under the lease. *Id.* at 823. The United States District Court for the Northern District of Georgia held that the security deposit was merely money and did not fall into any other classification. *Id.* at 827.

This court finds *Atlanta Times* persuasive authority for the proposition that a utility deposit should be treated as money. As in *Atlanta Times,* the Debtors' utility deposit was used to secure performance of contractual rights. By classifying the utility deposit as money, it is specifically excluded from the definition of a general intangible. Therefore, the security deposit cannot be a general intangible.

Money is afforded special treatment under the UCC. Under § 9.304, money can only be perfected by possession. TEX.BUS. &

COM.CODE ANN. § 9.304 (Tex. UCC) (Vernon 1991). Section 9.304 states in subpart (a) that "a security interest in money or instruments (other than certificated securities or instruments which constitute part of chattel paper) can be perfected only by the secured party's taking possession." *Id.* SNB never had possession of the utility deposit; it was kept with the Co-op. Consequently, SNB never perfected its security interest in the utility deposit.

### Conclusion

Based on the stipulations and briefs of the parties, the court finds the capital credits are general intangibles. As such, they are covered by SNB's properly perfected security agreement. The court finds the utility deposit is properly classified as money, not as a general intangible. Since money can only be perfected by possession, SNB did not properly perfect its security interest in the utility deposit. Therefore, the stay is lifted as to the capital credits, but not as to the utility deposit.

ORDER ACCORDINGLY.[3]

---

**3.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to FED. R.BANKR.P. 7052 which is made applicable to Contested Matters by FED.R.BANKR.P. 9014. This Memorandum will be published.